In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 06-2222

KAREN BOMBACI,

*Plaintiff-Appellant,*

*v.*

JOURNAL COMMUNITY PUBLISHING GROUP, INC.,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 04-C-326—**J.P. Stadtmueller**, *Judge.*

---

ARGUED FEBRUARY 9, 2007—DECIDED APRIL 10, 2007

---

Before BAUER, FLAUM, and WILLIAMS, *Circuit Judges.*

FLAUM, *Circuit Judge.* The EEOC and Karen Bombaci sued Bombaci's former employer, Journal Community Publishing Group ("JCPG"), for sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2 & 2000e-3. The district court granted summary judgment in JCPG's favor, and Bombaci (but not the EEOC) appeals the district court's ruling on her sexual harassment claim. For the following reasons, we reverse.

## I.  Background

JCPG publishes community newspapers in Hartland, Wisconsin. In August 1998, Bombaci began working at JCPG's printing facility as a first-shift pressroom jogger. That position required her to take newspapers off of the press, stack them in piles or on a skid, take out the trash, and wash printing machines. She worked at the facility with fellow jogger, Sarah Stoll, and a number of press operators, including Paul Hansen, Brian Wampner, and Glenn Mueller. James Creasey managed JCPG's printing facility.

Bombaci claims that shortly after she was hired, Wampner and Mueller began sexually harassing her. Their conduct, if Bombaci's allegations are accepted, was repugnant. Bombaci says that Wampner grabbed her breasts and pulled down her shirt to reveal her bra "all the time." She also claims that he placed a newspaper between his legs and shoved it between her legs, bent over in front of her and pretended to have sex with her, pulled his pants down to his knees, grabbed her buttocks, and talked to her about various sex acts. Bombaci further alleged that Mueller rubbed his body against hers, looked down her shirt, and made extremely vulgar sexual comments to her on a weekly basis. Hansen and Stoll corroborated many of these allegations, and Mueller acknowledged that he engaged in sexual teasing.

Bombaci stated that she found the harassment unwelcome but did not personally complain to anyone other than Stoll until March 2001. Nevertheless, Bombaci claims that sometime in 1999, Stoll told her that Stoll had reported the harassment to Creasey. In her deposition, Bombaci testified, "[Stoll] told me she told Jim that the guys were harassing me and it was going on for a while, and she did tell me that Jim told her to go up front, to say something up front." Bombaci says that she understood "go

up front" to mean that Stoll should tell Gary Jasiek, JCPG's vice president. Neither Stoll nor Bombaci reported Bombaci's concerns to Jasiek.

In January 2001, Wampner threw a crushed paper cup, which hit Bombaci in the face, cutting her under the eye. Creasey noticed the cut and asked Bombaci what happened. After Bombaci recounted the incident, Creasey issued Wampner a written reprimand. In February 2001, Wampner yelled profanities at a group of workers, and Creasey gave him a verbal reprimand. Also in February 2001, Creasey asked Stoll why she and Bombaci rarely worked with Wampner and Mueller. Stoll responded that "those guys are really bad the way they talk." Creasey asked Stoll and Bombaci for details, but they both refused to provide further information.

On March 27, 2001, JCPG held an "employees only" meeting to introduce Cynthia Barrows, a new employee in the human resources department, to the other employees and to discuss the employee handbook. In an effort to make employees more willing to discuss work-related issues, supervisors were not allowed to attend the meeting. Bombaci stated that she was surprised when she saw Stoll at the meeting because she thought that Stoll was a supervisor.

After the meeting, Bombaci returned to her work duties. As she was stacking newspapers, Wampner allegedly looked down the front of her shirt. Stoll stated that she saw Wampner and yelled at him to stop and that Bombaci began crying and said that she could not take the harassment any longer. Stoll suggested that Bombaci report the conduct and agreed to accompany Bombaci for support. Stoll did not want Wampner and Mueller to get fired, however, so she told Bombaci not to name the harassers. Stoll and Bombaci met with Barrows and spoke in general terms about the harassment.

On April 5, Barrows spoke with Bombaci about the allegations a second time, and Bombaci finally named Mueller and Wampner. She also stated that she feared Stoll would retaliate against her for naming the harassers. On April 6, Barrows met with Hansen, and he provided specific examples of Wampner's and Mueller's harassment. The same day, Jasiek, Barrows, and Creasey interviewed Wampner and Mueller. Wampner admitted pulling on a female employee's shirt, and Mueller acknowledged swearing and commenting on women's clothing during work hours. Shortly afterwards, JCPG terminated them. In the months after Mueller and Wampner were fired, Bombaci felt that her co-workers ostracized her. On September 27, 2001, she faxed JCPG a letter of resignation.

The record discloses other incidents of inappropriate conduct on the part of Mueller and Wampner. In 1996, Creasey heard Mueller state that he liked the company's new refrigerator because women had to bend over to look for their food. As a result, Mueller received a written reprimand. Sometime during the summer of 2000, Crystal Hagen, a supervisor in another department, learned that Wampner had made an inappropriate sexual comment to Hagen's 14-year-old niece. Hagen did not report the incident to Creasey or Jasiek. During another incident (it is not clear when it occurred), Wampner and Mueller stuck pictures of women in bikinis to the printing press that they operated. When Creasey saw the photographs, he promptly removed them.

Creasey testified that he never observed Mueller and Wampner harass Bombaci and that he first learned about the harassment when Stoll and Bombaci complained to Barrows. Though Bombaci does not remember Creasey witnessing any acts of harassment, she testified that many of the acts occurred near Creasey's office, which was thirty feet from the nearest press area. Creasey's

desk faced away from his door (which had a window), and Wampner and Mueller's press was not visible from Creasey's office. When Creasey was in his office, he could not hear conversations in the press area because he usually kept the door to his office shut and the presses were very loud when running. Most of the alleged misconduct occurred when the presses were running, and Mueller testified that he did not engage in horseplay when Creasey was watching him.

JCPG distributes to all new employees an employee handbook that contains the company's sexual harassment policy. The policy states:

> If you believe you have been harassed[,] you are encouraged to come forward without fear or reprisal by telling your supervisor/manager; . . . telling a supervisor/manager not in your work area; . . . telling the human resources manager; or . . . telling the president of Add Inc.

New employees also watch a video that identifies individuals to whom employees should report sexual harassment. Bombaci testified that she received an employee handbook but did not read the sexual harassment policy. She did watch the video.

Bombaci further testified that she believed that she was reporting harassment to a supervisor by discussing the problem with Stoll. She thought Stoll was a supervisor because she went to Stoll for her work assignments and to ask for sick or vacation leave and because Stoll trained Bombaci when she started her job. Stoll's description of her job duties is consistent with Bombaci's description. Stoll testified that she assigned duties to employees, helped Creasey with payroll, drafted administrative reports, notified employees of meetings, supervised joggers during Creasey's vacation, and tracked employees' vacation and personal days.

The district court granted summary judgment in JCPG's favor, ruling that Mueller's and Wampner's harassment was severe and pervasive but that Bombaci had not offered evidence from which a jury reasonably could find that JCPG acted negligently in discovering the harassment. The district court concluded that none of Wampner's or Mueller's pre-March 2001 conduct gave Creasey notice that Bombaci was being sexually harassed, that Bombaci could not reasonably have believed that Stoll had the authority to respond to complaints of sexual harassment, and that Bombaci knew or should have known how to report correctly the sexual harassment but failed to do so. It also ruled that JCPG did not retaliate against Bombaci.

## II. Analysis

Bombaci has appealed the district court's summary judgment ruling on her sexual harassment claim, which means that we must determine whether she has offered evidence from which a jury reasonably could find that JCPG required her to work in a "discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). If a co-worker creates a hostile work environment, an employer can be held liable only if it was negligent in discovering or remedying the harassment. *See Phelan v. Cook County*, 463 F.3d 773, 784 (7th Cir. 2006). A plaintiff alleging co-worker harassment must offer evidence either that she notified the employer about the harassment or that the harassment was so pervasive that a jury may infer that the employer knew about it. *See Zimmerman v. Cook County Sheriff's Dept.*, 96 F.3d 1017, 1018-19 (7th Cir. 1996). In some situations, the notice may come from someone other than the victim. *See id.* at 1019.

Bombaci makes three principal arguments in support of her contention that a jury reasonably could find that JCPG acted negligently. Only one argument is meritorious.

**A.  Sarah Stoll**

Bombaci first argues that JCPG was negligent in remedying Mueller's and Wampner's harassment because Stoll was a supervisor who should have forwarded Bombaci's complaints to higher management. "Where an employer sets up a 'point person' to accept complaints, 'this person becomes the natural channel for the making and forwarding of complaints, and complainants can be expected to utilize it in the normal case.'" *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1035 (7th Cir. 1998) (quoting *Young v. Bayer Corp.*, 123 F.3d 672, 674 (7th Cir. 1997)). "Where a point person [i]s not identified or easily accessible, an employer can receive notice of harassment from a 'department head' or someone that 'the complainant reasonably believed was authorized to receive and forward (or respond to) a complaint of harassment.'" *Id.* JCPG's sexual harassment policy set up a number of point people, including all supervisors, to receive sexual harassment complaints. Therefore, we must determine whether Bombaci has offered evidence indicating that she reasonably believed that Stoll was a supervisor or, at the very least, that Bombaci reasonably believed that Stoll was someone whose duties required her to forward sexual harassment complaints to higher management. *See Valentine v. City of Chicago*, 452 F.3d 670, 678 (7th Cir. 2006); *Young*, 123 F.3d at 675.

In *Parkins*, the plaintiff's employer had a sexual harassment policy that advised employees to bring complaints to their "immediate supervisor." The plaintiff, who was a truck driver, said that she complained to a man named Spellman, who assigned truck drivers to work with particular construction crews and called the truck drivers' union to request additional drivers. Spellman had little discretionary authority, and even that authority was subject to a superintendent's approval. We held that

Spellman was not a supervisor and that the plaintiff could not reasonably have believed that he would refer her complaints to higher management. We said that Spellman's "limited duties and authority, coupled with [the plaintiff's] daily access to and observance of people with authority to correct the problem, made it unreasonable for [her] to believe that Spellman was the type of employee who could be expected to convey her complaints to someone who could stop the harassment." *Parkins*, 163 F.3d at 1038. By contrast, in *Valentine*, we held that a plaintiff notified her employer of sexual harassment when she complained to an individual who supervised forty to fifty employees and was authorized to transfer employees to different job sites. 452 F.3d at 678.

In this case, Stoll's most significant tasks, assigning duties to joggers and assisting with scheduling, were similar to the ones found insufficient to confer supervisory status in *Parkins*—assigning duties to truck drivers and requesting additional drivers from the union office. Stoll also distributed payroll checks, notified employees of meetings, and kept track of employees' vacation days, but those tasks are best described as secretarial. None of Stoll's duties suggest that she could effect the terms of another individual's employment in a way that could remedy sexual harassment.[1] Though Bombaci and other employees stated that they believed that Stoll was a supervisor, Bombaci has offered no evidence that this belief was reasonable in light of Stoll's duties.

---

[1] Bombaci also claims that Creasey told her that she should report to Stoll on her first day of work and that Stoll would tell her where to go and what to do. This evidence does not indicate that Stoll was Bombaci's supervisor. Employers routinely assign veteran employees to train their new co-workers in the basic duties of a job. This type of direction, standing alone, does not suggest that an employer anticipates the veteran co-worker will forward sexual harassment complaints to management.

### B. Constructive Notice

Bombaci next contends that Creasey must have known about Bombaci's harassment given its frequent, open, and long-lasting nature. *See Rhodes*, 359 F.3d at 507 ("[W]e could charge an employer with constructive notice where the harassment is sufficiently obvious."). In *Wilson v. Chrysler Corp.*, 172 F.3d 500, 509 (7th Cir. 1999), the Court held that an employer had constructive notice of sexual harassment where sexual "cartoons and fake penises were displayed in common areas or placed in open view at [the plaintiff's] work station . . . . [M]uch of the alleged misconduct was public and deliberately exhibition-ist." In *Waltman v. International Paper Co.*, 875 F.2d 468, 471 (5th Cir. 1989), the court held that an employer had constructive notice of harassment where "[s]exually explicit pictures and graffiti [derogating the plaintiff] were drawn on the walls of the powerhouse, on the restroom walls[,] and in the elevator." Additionally, employees placed sexually explicit calendars on the walls and in their lockers, which were kept open. *Id.* By contrast, in *Rhodes*, the Court held that an employer did not have constructive knowledge of harassment despite the employ-ees' regular viewing of pornographic films and magazines. The Court noted that no supervisor worked on-site and that employees acted as lookouts while the films were playing. *Rhodes*, 359 F.3d at 507.

On balance, the facts in this case are closer to *Rhodes* than *Wilson* and *Waltman*. Though Mueller and Wampner allegedly made numerous sexual comments and regularly touched Bombaci during the three years that she worked at JCPG, there is no evidence that the harassment oc-curred in front of supervisors. Bombaci concedes that Creasey kept his office door shut during the day and sat at a desk facing away from the door. The presses in the plant were very loud—people had to scream to be

heard—and neither Bombaci nor Hansen recalls Creasey witnessing any of the conduct. Bombaci claims that "a lot of things" occurred near her locker, which was right next to Creasey's office door, and that Creasey must have heard something because Wampner often screamed at her and she screamed back. Bombaci's testimony, however, does not indicate that Creasey should have known that such exchanges stemmed from sexual harassment. In short, Bombaci's evidence does not approach the exhibitionist misconduct found actionable in *Wilson* and *Waltman*. As a result, no jury reasonably could find that JCPG had constructive notice of Mueller's and Wampner's harassment.[2]

## C. Stoll's Alleged Statement to Creasey

Bombaci next argues that JCPG was negligent in remedying Mueller's and Wampner's harassment because Stoll reported the harassment to Creasey. Bombaci testified that sometime in 1999, Stoll told her that Stoll told Creasey that "the guys were harassing [Bombaci]" and

---

[2] Bombaci also contends that JCPG had notice of sexual harassment because Creasey witnessed Mueller make sexual jokes from time to time and removed pictures of women in bikinis from one of the presses on which Wampner and Mueller worked. She also notes that another manager, Hagen, learned that Wampner made inappropriate comments to her niece. By themselves, these isolated incidents were not sufficient to notify Creasey that Bombaci was being sexually harassed because they did not come close to creating an actionable hostile work environment. *See McPherson v. City of Waukegan*, 379 F.3d 430, 441 (7th Cir. 2004) (holding that an employee's sexual comments, which were made to a group of female workers, were insufficient to notify the employer that the employee might commit serious acts of sexual harassment in the future because the comments did not create an actionable hostile work environment).

that Creasey told Stoll to "go up front, to say something up front." According to Bombaci, she understood Creasey's response to mean that Stoll should take the complaint to Jasiek, though neither Stoll nor Bombaci ever did so. Both Stoll and Creasey deny that such a conversation occurred, but on summary judgment, we do not measure the credibility of deposition testimony if it is admissible evidence of an employer's liability. *Paz v. Wauconda Healthcare and Rehabilitation Centre, LLC*, 464 F.3d 659, 664-65 (7th Cir. 2006). Here, there is a possibility that Stoll's alleged statement was an admission by a party-opponent, *see* Fed. R. Evid. 801(d)(2), and JCPG does not argue otherwise.[3]

Assuming the statement can be offered for the truth of the matter asserted, a jury reasonably could find that JCPG's response to Stoll's complaint was negligent. JCPG appointed Creasey as one of several individuals to whom employees should bring complaints of sexual harassment, and Creasey knew that Mueller had made inappropriate sexual comments in the past. One could conclude that Creasey, aware of a significant risk of sexual harassment in the workplace, had a duty—minimally burdensome—to contact Bombaci or at least make sure that another supervisor did so. *See Young*, 123 F.3d at 675. Instead, Creasey allegedly passed off this important responsibility to Stoll, a lower-level worker with no authority to remedy sexual harassment, and did not speak with Bombaci or Jasiek to make sure that the problem was being addressed.

---

[3] We decline to resolve definitively whether the statement is hearsay because it is a fact-based issue that depends on whether Stoll made the statements within the scope of her authority as an agent for JCPG. *See* Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 801.33[1] (Joseph M. McLaughlin ed., 2d ed. 2006).

Though we have held on several occasions that an employer reasonably can expect a victim of sexual harassment to make some minimal effort to follow up on an initial complaint when the employer requests her to do so, *see, e.g., Jackson v. County of Racine*, 474 F.3d 493, 502 (7th Cir. 2007) (holding that an employer acts reasonably where it attempts to follow up with complainants, but complainants do not respond), we have never held that an employer acts reasonably where a supervisor receives a credible complaint of sexual harassment and no effort is made to contact the alleged victim. Under these facts, a jury reasonably could find that JCPG acted negligently.

## IV. Conclusion

The Court REVERSES the district court's ruling and REMANDS for proceedings consistent with this opinion.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*